First I want to express my appreciation. We had, because of some logistical problems, we had to move the scheduling several times. I know how frustrating that is to get a call one day you're on Monday, one day you're on Tuesday. Nobody complaining. I appreciate your patience with that and I appreciate you traveling here today. Judge Noonan and I would also like to welcome to the panel Judge Robart from the Western District of Washington. We appreciate the time that you've taken to join us on the panel today and appreciate your contributions to the Ninth Circuit. With that, we're prepared to hear oral argument in this matter. Have the parties decided who is going to go first? The court has allocated 15 minutes to each of the three appellants. My plan is to use 10 minutes of my 15 minutes with my opening and then reserve 5 minutes for reply after Mr. Swift has completed his argument. The fund eventually grew to, I guess, some $30 million in securities at about the time that Merrill Lynch filed the interpleader in 2002. Our position as Arelma is that the account is owned by Arelma and that the assets that are the subject of the interpleader should have been awarded to Arelma as its property. The question then arises, what happens to the assets if they're awarded to Arelma? The answer is that Arelma's share certificates, which are bearer share certificates, are in the possession of Philippine National Bank, my other client, which has held those share certificates in escrow since prior to the time that this interpleader proceeding was filed. They are holding those share certificates pursuant to an agreement, which requires them to hold any assets of that type, which would include these assets, which are the subject of the interpleader in escrow, pending a determination by a court of competent jurisdiction in the Philippines as to the ownership of those assets as between the Republic of the Philippines on the one hand or the Marcos estate on the other hand, which is the judgment debtor of Mr. Swift's clients. So in any event, we participated in the court below because we were named as defendants and claimants. We asserted the claim on behalf of Arelma as owner of the funds. We sought reversal of the judgment on a number of different grounds, and I certainly won't have time to discuss all of them, but they basically fall into two different areas. One would require a reversal and direction to enter a judgment in favor of Arelma, such that the assets would be awarded to Arelma to be held in the escrow by Philippine National Bank. And that result would follow on several alternative grounds that we've argued, one being that Pimentel, the party who prevailed on behalf of the class of judgment creditors, was not a real party in interest, but he did not have standing to assert a claim to the Arelma assets because as an unsecured judgment creditor of the Marcos estate, he or the class of judgment creditors did not have any specific property interest or lien in any of those assets. And therefore were not a proper claimant to the interpleaded fund. They were an unsecured creditor of the Marcos estate at best, even assuming that one were to conclude that the assets were at one time owned by Marcos or his estate, but that was never established before the case was filed. And by virtue of attempting to establish that and arguably establishing that, although we disagree that the evidence supported that conclusion, establishing in the case below that Arelma was an alter ego, they cannot hopscotch over Arelma. The right to assets in interpleader is determined as of the time the action is filed, not based on some determination made during the course of the interpleader. Although claims are adjudicated in the interpleader, the claimant has to have standing, has to be a real party in interest at the time the case was filed. And in this case, Pimentel did not because it had only an unsecured judgment, no interest in any of the assets. If it was going to get an interest, it would have had to have probably garnished Merrill Lynch with a writ of execution based on its judgment. That never happened, so we don't think that Pimentel had the standing to make the claim. Secondly, there is the overarching issue about whether or not the evidence supported a judgment awarding the assets to Pimentel on behalf of the class. And as you can see from our brief, there were a number of issues that we raised on appeal on that particular question. Some of them are legal issues. Some of them argue that the findings of fact by the district court were clearly erroneous because they were not based on any evidence, or at least not sufficient evidence to support findings because there were errors in admitting evidence and conclusions and findings that were based on no evidence at all. One of the overarching issues, I think, on the substance of Pimentel's claim that Arelma was an alter ego of Ferdinand Marcos is the choice of law issue. We contended that Panamanian law is the applicable law to be applied to determine any alter ego claim in this case because Arelma was incorporated in Panama. It was always a Panamanian corporation and it was in good standing at all times. The district court even found that Arelma was a Panamanian corporation in good standing even up to the time through trial. Yes, in your brief you asserted that under Panamanian law, the corporate veil could not be pierced. Is that right? That's right. But I noticed that there wasn't a citation to a case in the brief. There was a citation to the excerpts. How do we know that? What we did in the court below to try to establish that was we had a Panamanian law expert who prepared a report. It was filed and served on all the parties well before trial. We were going to have that Panamanian law expert testify at trial. Pimentel made a motion in limine to exclude any expert witnesses on foreign law and to exclude the reports. The district court granted that motion at the request of Pimentel. So we and the other parties were precluded from adducing any evidence of foreign law other than through what the district court allowed. He said that all I want to see is copies of any foreign cases or statutes which used to establish foreign law and I'll decide what foreign law is. So based on those rulings, we were left with no alternative but to submit an appendix or I guess it was a request for judicial notice, but in some form it was put before the district court, different Panamanian statutes and cases, which we said stood for the proposition that Panamanian law does not recognize the alter ego doctrine except in criminal cases. And I think our showing was sufficient to show that, albeit somewhat incomplete, because it would have been helpful I think to have an expert explain the cases and the law and flesh it out a little bit. Those cases and statutes are also part of the record here. And although I guess Mr. Swift would argue how the Panamanian law should be interpreted, I think even he has said in his brief that it appears that Panamanian law is that alter ego is generally not recognized in civil litigation and would only be recognized either in a criminal case or possibly where there's a theft of a property from the Panamanian government. So it's our view that if a proper trace of law analysis was made, it would have led to the application of Panamanian law, which would have rendered it legally impossible for Pimentel to have successfully asserted his alter ego claim. In our brief, we went through a fairly lengthy analysis of the choice of law issue. Basically, since the case was venued in the District of Hawaii, we said that Hawaii choice of law rule should be applied, that under Hawaii law there are no reported cases that anybody could find that says what substantive law should be applied, where there's an alter ego claim that Hawaii law generally provides in the absence of case law. They'll look to the restatement of conflicts. The restatement of conflicts has a section 307, which directly relates to claims for alter ego, but basically where someone who's a corporate creditor is trying to pierce the corporate veil to fasten liability on an individual. This case is the reverse of that, reverse alter ego, where someone's trying to fasten liability on the corporation for the liability of an alleged shareholder. But in any event, we think that that was the most applicable choice of law rule, and that choice of law rule under section 307 of the restatement is that the court should look to the law of incorporation of the corporation whose veil is to be pierced or allegedly sought to be pierced. So we think that the proper choice of law analysis would have applied that rule and led to the application of Panamanian law. I also wanted to briefly touch on the subject matter jurisdiction issue, because I think that's an important one. If that were a ground for reversal, it would, I think, have to result in the dismissal of the case. I think it's a good argument on a couple grounds. This is an interpleader. The general rule is subject matter jurisdiction is determined at the time an action was filed, and in interpleaders there can be no subject matter jurisdiction unless the asset is located within the district in which the interpleader is filed. Here that was not the case. The interpleader was filed in Hawaii at the time it was filed. The Arelma assets were still with Merrill Lynch in New York. It was only because the district court ordered Merrill Lynch to file the interpleader in Hawaii that it ended up there in the first place, which is really an attempt to manufacture subject matter jurisdiction. The assets arrived later, but that was insufficient to allow subject matter jurisdiction to be established at that point. I think I've used up 10 minutes. I wanted to reserve five more. If you have a question or two, I can take those now or I'll wait. Why don't you take your time for a follow-up? Thank you very much. May it please the court. My name is Stephen Bonsi, and I appear here today on behalf of the Republic of the Philippines and its Presidential Commission on Good Government. The issue presented by this particular appeal by the Republic is whether a court can proceed to adjudicate ownership of interpled funds where one of the claimants to those funds asserts immunity from suit and thus isn't subject to the court's jurisdiction. The Republican PCGG believe that the answer to that question is no, and that, as a result, the judgment below was erroneous as a matter of law. The case instead needs to be dismissed for lack of an indispensable party under Rule 19B. Now, as the court is doubtless aware, this is not the first time this matter has been before it on appeal. And in an earlier appeal in this case, which is reported at Volume 309, Fed Third, the court determined two things which are highly important here. First is that, in fact, the Republican PCGG are entitled to immunity in this particular case. And second, that they have a claim to a realm of funds which is independent of the claim of any other party. Under ordinary circumstances, the court would, as it noted, have needed to determine whether or not the Republic was an indispensable party. However, because of the particular procedural posture of the case, the court was able, with the agreement at that time of all parties, simply to stay the matter, pending the possibility that a resolution of litigation in the Philippines might, at some time, make it permissible for the action to go forward. Instead, what happened was that the court, the district court in Hawaii, Judge Riel, vacated the stay, and then, a month later, proceeded to hold a hearing on a motion brought by Mr. Pimentel to determine the question of indispensability. And the court ruled that, in fact, the Republican PCGG were not indispensable. It is that ruling, which, of course, later became merged in the final judgment after trial, that is now the subject of this appeal. Our view is that the court could not, as we say, as a matter of law, have made that determination. If it is not the case that a party which is immune cannot have an interpleader action dismissed without adjudicating its substantive rights, then the supposed acknowledgment of its immunity is really a hollow one indeed. The whole nature of an interpleader action is one in which claims of all parties are determined with finality. If that cannot occur, or more particularly, if the rights of a party claiming immunity can be determined adversely to it in its absence, then the ability to assert immunity, as we say, has no meaning whatsoever. And we believe that that is not only a determination made many times over by this court in cases that we have cited in our brief, but is, in fact, a matter of logic that is simply quite unassailable. Now, I want to try to mount it. It seems to me that what you're saying, though, if we accept that proposition, is that the sovereign party really controls both sides of the game. If they wish to stake a claim to an asset, then it seems that they appropriately would do so in the jurisdiction which is holding the asset, and that would require them to, in effect, waive their sovereign immunity. But it's their decision by pursuing the asset. What you're setting out for the court would be the rule that not only are they able to stake their claim to the asset, but they also can require someone to go to their jurisdiction in order to pursue that claim. Well, in fact, one can envision a case, Judge Robart, in which that would exist. And I believe, again, that the precedents of this court, mostly in cases involving Indian tribes, rather clearly stand for the proposition that even where there is no alternative forum, let alone a forum that the sovereign has chosen, that nonetheless the interest in recognizing sovereign immunity as a matter of law must be acknowledged. However, here, we don't actually even reach that difficult position because, in fact, what would happen if this matter is dismissed here, as we believe it needs to be, is that litigation in the Philippines over the Aroma assets will proceed to conclusion. Motion for summary judgment has been filed and fully briefed and will be disposed of in accordance with whenever the Philippine courts get to it. When that matter is finally resolved, one of two things will have been determined. One, either it will have been determined that the assets belong to the Republic of the Philippines, which is what we believe is the case, or two, it will have been determined that the assets belong to the Marcoses. If the assets, in fact, belong to the Marcoses, then the proceedings here could continue because there would be a judgment creditor of the Marcoses, assuming that you can get through the Marcoses to Aroma. I'm assuming that Pimentel, if they're otherwise entitled to the funds, would be able to make a claim to them here. The one thing, though, that cannot happen, and again, I suggest that this is rather clearly determined by this court's precedence, is that the Republic can be forced either to litigate its claim here or forego it. That is exactly what the sovereign immunity principle forbids. It precludes it. And again, I think if one looks, whether it's American Grand, whether it's Delap and Dale, whether you go back to Pitt River or you go to cases in other jurisdictions, this is a rule that I think has received sufficient approbation that it's not really open to serious debate here. And I understand that in some ways what we are saying is that we have the ability, as a foreign sovereign, to influence the course of American judicial proceedings in the same way that I believe Americans would expect, and certainly the United States government would expect, that if it were going to be hailed into a foreign court, that it would be able to assert its immunity. This is a principle of really quite great international importance, and the application of it here is rather routine. As I say, this court has again and again dismissed cases under Rule 19B in very analogous circumstances. The claim, as I say, to do that here is not only less harsh because of the result that I have just described and which we lay out in our brief, but in addition, there is yet another reason why here it is particularly required. And that has to do with the notion that the particular claim that is at stake here is a claim that is rather uniquely governmental and uniquely local and politically important in the Philippines. That is, the attempt to get back the money which former President Marcos misappropriated while he was in office. And here I have to call the court's attention, and we've submitted a letter on this, to a subsequent decision in the Philippine National Bank case decided just a month ago, in which this court held that the forfeiture proceedings, of which the aroma proceedings are a part, that those proceedings themselves constituted an act of state. They held them, even though ordinarily, as the court recognized, acts of state are not matters of judicial decision. But the court said in that case, here we would have to be blind to the realities to not understand the context in which this arises. That is, this is an effort by the Philippine government to right the doings of its former president, a matter that is so obviously of the greatest political importance in the Philippines that we could not regard it as anything other than an act of state. The fact that it is acknowledged as an act of state, it seems to me, underscores in a rather dramatic way the relief which we seek here. That is, if this court were to affirm the decision below and allow the aroma assets claimed to have been misappropriated property from the Philippines to go to some other claimant, the court would, in effect, have frustrated the ability of the Philippine government to engage in this act of state, to seek a judicial decree awarding the property as having been misappropriated from the Philippines. Can I ask you about the sovereign? In one case that's come to our attention, the state of Idaho, H.L. Evans, against states of Oregon and Washington, where the United States was the sovereign, and apparently the relief would affect what it was doing, but it was treated as not indispensable. Are you familiar with that? I am not, Your Honor. I must admit. However, if it is a case which the court believes of particular importance, we'd be happy to address it. I think there are a sufficient number of cases dealing with the United States, as well as dealing with Indian tribes and foreign governments in which the rule that we rely on here has been applied, that I would be surprised if there were a case which purported to adopt a different principle. As I say, there is a considerable number of cases in this court. Apart from that, why has the sovereign government of the Philippines not taken some step in the Philippines to get a ruling on this? It has. Why doesn't it get it? A litigant is not the master of proceedings. The Philippines filed an action many years ago seeking forfeiture of all ill-gotten assets. It has thus far gotten a summary judgment as to a number of them. The decision by the Philippine Supreme Court within the last couple of years did not, by its terms, specifically apply to Arelma. Therefore, the government has gone back to the Sandigan Bayan, which is the anti-corruption court in the Philippines, has filed a motion for summary judgment. I believe the papers are before you. I have them here if you need to see them. But they have filed a summary judgment motion specifically directed to Arelma. And how long has that been pending? The separate motion was filed after the Philippine Supreme Court decision because it didn't, by its terms, deal with Arelma. That has been pending now, I believe, for approximately a year and a half. And the courts there don't move as quickly as we would like to think. Sometimes courts ought to move. But, again, litigants don't control that. And it seems to me that that is scarcely a ground on which this court could find that the Philippines, which has been held to be immune, somehow can nonetheless have this asset determined not to be its property. Our view is that the only circumstance in which Rule 19B dismissal could possibly be justified is where there was a determination made that the interests of the Philippines would not be impaired. In this case, quite to the contrary, the court's Rule 19B ruling, Judge Riel's 19B ruling, was made on the ground that the Philippines do not have a claim because of the statute of limitations. But that's an adjudication of the merits. It's exactly what another panel of this court said in the Republic case could not be done. If you simply substitute the words statute of limitations for real party and interest, which was the way in which the court previously tried to say the Philippines had no claim, you would have this ruling already made. So that is not a ground on which you could possibly allow the Philippines not to be entitled to dismissal under Rule 19B. With the leave of the court, I'd like to reserve my remaining time. Good afternoon. I'm Daniel Cathcart. I represent the Golden Buddha Corporation in the state of Roger Rojas. Perhaps you can tell us why do they misspell Buddha when they get naming the corporation? If it doesn't count against my time, I'll be happy to do that. A judge whose name was Rojas, who was uncle of Ferdinand, was given a search warrant typed by a fellow who misspelled Buddha. They claimed the documentation was typed by separate people. The witness statements typed by separate people. But all of the documentation ended up with Buddha misspelled on the same typewriter. And just because of irony or something, when the Golden Buddha Corporation was formed, it was misnamed with Buddha being misspelled. A little joke. That's what it amounts to. I'd like to... We've pierced the corporate veil, I guess, here. We could pierce that one. I'd like to have 12 minutes for my opening remarks and three minutes for my response. Since this case was briefed, this court has come forward with a decision which I think is determinative as to whether or not Judge Reel had jurisdiction. That's the case of Marshall v. Marshall, which our briefs were filed in late December, but this came out December 30th. That decision deals with the conflict between state and federal courts and jurisdiction related to matters of probate. And if we look at what that decision says, it is very clear that the federal court probate exception is strong, it's wide, and it's one which demonstrates that the court had no jurisdiction. If we look at the record in this case, we see Judge Reel determining, first of all, that this property, this fund, whatever it may be in possession of the court, is Marcos property. If that's the case, it belongs in an estate established to probate the Marcos property. But he went beyond that. He went to the point of determining the merits of various claims against that property. He also determined the priority of claims against that property. If we accept your position and dismiss the case for lack of jurisdiction, where would that leave you in this litigation? Well, as long as the money for the fund, we don't know what's in that fund, but that leaves us with the opportunity of opening a probate in Hawaii in the state court system, which under Hawaii law is exclusive and probating it. And that eliminates the problems, the difficult problems this court faces. There are more issues in this case than there are in a three day bar examination. And we have indispensable parties. We have other jurisdictional issues. We have, in addition, acts of state. Wouldn't all of your charges be raised, though, in the state court litigation? I mean, if the Republic is an indispensable party and has a claim against the estate, doesn't that have to be resolved in the Philippines? I don't see why it should. The property is in Hawaii at the moment. In the usual probate proceeding, notice is given to creditors and an opportunity to come forward and present their claims. And the probate court can determine whether or not the claim should or should not be honored. And there is no problem with active state sovereign immunity, indispensable parties. You're invited to attend. You're not forced to attend. And we have heard in this this court what I've heard in the lower courts is the allegation that the Philippine government says the money was stolen from us. But nowhere has the Philippine government come forward with one scintilla of evidence that this money or any other particular fund of money or property was stolen from the Philippine government. So at this point, we have no proof, nothing substantiating the claim of the Philippine government that this was, in fact, their money. I have tried. You were not participating in the litigation in the Philippines. Is that right? I mean, you're definitely not participating as a matter of choice. And if we look at this cases in Switzerland, they required the Philippine government upon the transfer of the funds, which I had attached in Switzerland to provide a method whereby claims could be presented to that fund. That was many years ago. I think I can't remember, but eight years ago, there's still nothing done in the Philippines to get this process started. And I'm getting older and I don't expect to ever see it done based on a performance here. So I would urge this court to dismiss this action. The property is still in the United States of America, subject to the jurisdiction of the probate court in Honolulu. And the problem can be resolved there. Sovereign immunity, active state or some indispensable party argument is not a problem in probate. As far as the. Other areas are concerned, some of which have been touched upon. I, too, join in asserting the problem that is faced by Pimentel. They did not and could not prove that they have any interest in the fund established at Merrill Lynch without interest in that fund. They can't recover into this action further if the property is stolen. And I offered a considerable amount of evidence that it was stolen. And the present record without my evidence permits a strong inference that it was stolen because of the way it was handled. And because a civil servant suddenly ends up with two million dollars in just after he steals a Buddha, some gold bars and some diamonds from my client, who for a while was the Philippine answer to Indiana Jones. He took that property and I can make a temporal link between that property and the opening of the account with Merrill Lynch in New York and that some of that evidence was excluded. But there is no evidence that Marcos lawfully acquired that money. And I think it's fundamental. Hornbook law. I don't know if they're still hornbooks anymore or not, but they were when I went to school. It was fundamental law that a thief cannot use stolen property to pay off his debts. Pimentel class of human rights victims are certainly entitled to be compensated, but not from property stolen from somebody else. And that's the problem that they face. In addition to the problem that they have no interest in this particular fund of money. We have an interest in the fund of money because I believe we can establish that there was a connection between the theft and Marcos becoming wealthy and the opening of the account. And part of that evidence process, a member of the class represented by Pimentel. Was Rojas a member? No, he was not, sir. The class begins with the declaration of martial law in September of 1972. The wrongdoing of the theft of the treasure and the imprisonment of Rojas occurred in early 1971. So he was not a member of the class. He the Supreme Court opinion. The first time our case went up, the state court case went up, said that Rojas opted out. There is no evidence that he ever opted out or opted in or was given the opportunity to opt at all. And where does your case stand now? My case is in the Supreme in this Supreme Court of Hawaii for a second time. It's languishing there. It's been there approximately three years. We have no date for argument, although the court sometimes does not hear oral argument. It sends you a result in the form of an opinion in the mail. So we have two courts, very swift. Yes, we do. So I don't know what the Supreme Court of Hawaii is going to do to us a second time. But hopefully they'll correct the errors they made the first time. I come to you pointing out certain evidentiary errors, such as the exclusion of the deposition of Mr. Buckley because of time constraints. I'm not going to do any more than saying that counsel waived the rule by going forward with a deposition if he legitimately was entitled to a report. We do not believe an export report was called for. But in any event, the damage or injury to him was nonexistent. He was given the opportunity to take the deposition over again if he wished to. Mr. Buckley did not appear at trial. His deposition was offered. So it was a record which he was intimately familiar with. And he asked every being the competent counsel that he is. He asked every conceivable question that a good lawyer would ask. And so I would ask say that the exclusion of that evidence was prejudicial error. The other depositions were excluded or testimony given in other litigation where the motives of the questioner being representing the Marcos family was the same. They wanted to show he didn't steal the money, that the money was not stolen. And if so, that the amount was not as great as we claimed it was. That's the same position that Pimentel is in at this point. One other thing is we still have pending in the state court in Hawaii an action for constructive trust. One of the solutions to this problem is since the interpleader is an equity that this court, if it determines there is sufficient evidence to support it, award the funds by imposing a constructive trust on them so that the party who is the victim of a theft could recover at least some compensation for what was lost through the criminal acts of Ferdinand Marcos. That sum is at the moment in excess of our present judgment, but this court can award the entire sum to us, my clients, because if it isn't done, Marcos or his estate profits from his wrong. And therefore, the entire fund should be awarded to the Golden Buddha Corporation with as misspelled as it is. I see my time is up and I thank you for your kind attention. Thank you. May it please the court. My name is Robert Swift. I'm of a Philadelphia law firm of Cone, Swift & Graf. And for some 19 years, I have represented 9,539 victims of torture, summary execution, and disappearance in the Philippines. I don't think there's any judge on the Ninth Circuit that doesn't know about this case and know about the various permutations that has fallen through it. For the last 10 years, I have been engaged in trying to collect that judgment. Collect it as is our right using U.S. law and procedures. This case began four and a half years ago when I obtained credible information that there was Marcos Mani residing in an Arelma account at Merrill Lynch in New York. At that time, I filed a lawsuit against Merrill Lynch. Merrill Lynch didn't want to defend that lawsuit. And because I had noticed depositions right away, it was conferenced before Judge Reel. And Judge Reel suggested that Merrill Lynch proceed with an interpleader. I had already talked to Merrill Lynch about doing that and doing it in Hawaii. The case was ultimately transferred to Judge Reel in Hawaii in part because he's been the MDL judge under their procedures. I should mention that after the interpleader was filed, the first thing the Republic of the Philippines did was not to assert sovereign immunity. The first thing it did was to move to recuse Judge Reel. And a separate judge of the Hawaii District Court rendered an opinion saying that Judge Reel, there was no basis for recusal and wrote an eight-page decision, which is part of the record in this case. That record makes findings which are entirely contrary to most of the allegations contained in the briefs of the appellants. Now, one advantage this panel has over that of other judges who have heard this matter, and I'm sure you know there have been almost a dozen appeals and mandamuses in this action alone, your advantage is that you have the benefit of a complete record. The panel that was chaired by Chief Judge Schroeder two and a half years ago only had a record which consisted of the initial motions that had been filed. So when you consider your opinion in this matter, you have to decide what are the facts of record, what can you rely on, what you can't. And I knew that when I read the fact sections of the briefs of Relma and the Republic and Golden Buddha, that they weren't relying on facts of record. What they argued instead were facts which had been based upon matters not of record, not admitted into the evidence. And again, there was a trial in the merits here. So, for example, Mr. Bomsey quotes extensively from affidavits that he submitted early on in the matter and which were later stricken by Judge Reel. Why were they stricken? They were stricken because the Philippine government would provide no discovery to support those facts. But they're still argued before you as if they were facts. Mr. Cathcart, on behalf of Golden Buddha, has spent probably five pages arguing from depositions which he didn't put into evidence. Now, consider what his evidence was at trial. He moved a couple documents into evidence. This is the person who initially had a $40 billion judgment. It's been reduced by the Hawaiian Supreme Court to $19 million. He has an extensive record in that case. He had witnesses. The only evidence he offered other than a couple documents were depositions taken in the state court case and the testimony of someone that he now said was an expert. We had no objection to him putting in evidence of Mr. Buckley as a fact witness. And we had gone through the deposition testimony all counsel had to designate what was appropriate and what was objectionable testimony. Mr. Cathcart ended up not offering it at all. Now, Mr. Cathcart, and this maybe puts the cart a little before the horse because I would like to go sequentially through a number of items, but he has asserted that, well, of course we knew that Mr. Buckley was an expert witness and of course he was going to testify as an expert witness, except that I expressly took his deposition early on as a fact witness when he was listed as a fact witness in an early pretrial memorandum. I never took his deposition as an expert. Moreover, he never submitted an expert report. Now, in this day and age, after the Supreme Court's rulings on expert witnesses and all the decisions in this circuit on expert witnesses, not to submit an expert report in support of your expert in a case involving millions and millions of dollars that you hope to obtain, I submit is not an appropriate thing to do. And a district court judge is well within his reason to say, I'm going to exclude any expert testimony of this witness. It seems to me that's fairly simple. Now, the deposition testimony that had been proffered by Mr. Cathcart was taken in his state court golden Buddha case without me present, without my clients present, without us knowing anything about it. The hinge pin of his argument under Rule 804 is that the Marcoses were the predecessors in interest of my clients. Now, I find that very difficult to take since Ferdinand Marcos was found to ultimately be responsible for the torture, summary execution, and disappearance of my clients. So, Judge Real questioned Mr. Cathcart, who are the predecessors in interest? And the answer was Mr. and Mrs. Marcos. So, I don't think that there's a factual basis in the record for Golden Buddha and Rojas to be able to make a claim here. Let me go back and really start at the beginning. There's been a good deal of briefing dealing with the issue of jurisdiction. Obviously, and I think it's undisputed, that there's jurisdiction under the statutory interpleader, Section 1335 of Title 28, because at least two of the parties are of diverse citizenship and there's more than $500 at issue. There was an argument made that there can't be interpleader because the interpleader complaint was filed in advance of the assets being deposited. But the assets here were extensive. And as you know, most stock is held not by brokerages, such as Merrill Lynch, but by a custodian on Wall Street. And the custodian doesn't necessarily create soft certificates just whenever a brokerage firm asks it to. So, it took a while to do so. But there is case law in this circuit and others which holds that jurisdiction attaches or is perfected upon the filing of the assets. And it seems to me that only makes sense because otherwise it would defeat the purposes of the interpleader statute. But beyond that, there had been a motion by Merrill Lynch to amend its complaint. And it seems to me at the point of that amendment, all the assets were filed and that certainly jurisdiction was attached and perfected at that point. Now, we've also asserted that Section 1655 of Title 28 provides a separate basis for jurisdiction. Now, if you were to read the briefs of the other parties, you would think that 1655 is a legal low and grin. It's searching for its identity. It doesn't know what it is. I submit to you that it is, like statutory interpleader, a basis for federal question jurisdiction. And it isn't as if the same Congress passed all these laws. But 1655 provides that separate basis for in rem jurisdiction. Statutory interpleader, I think, is better classified as quasi in rem. A federal court within rem jurisdiction has authority to summon all parties before it who have any claim to the property. And that is what happened. There is a disagreement among counsel in the briefs as to whether statutory interpleader is based upon the constitutional authority for diversity jurisdiction or the constitutional arising under jurisdiction. It's really, I think, a little murky. And because in 1335 it mentions diversity as to a plaintiff and one defendant, there's a tendency to say, well, this must be diversity jurisdiction. But the statute, when passed, provided for nationwide service of process. I submit that that is not the case with regard to diversity jurisdiction provided under the United States Constitution. That's a bit of an esoteric argument. Now, Arelma has asserted that there's no personal jurisdiction over it. Of course, the nature of Arelma was simply, as we know now, based on evidence, admitted evidence of record, that was simply to hide the assets of Ferdinand Marcus. So Arelma's principal business was simply to have and have managed an account in New York. We submit that that account establishes personal jurisdiction over Arelma in the United States. We don't actually have to prove jurisdiction simply limited to one state under the interpleader statute or in REM. And it was asserted in Mr. Ziegler's brief that Judge Reel never made findings as to personal jurisdiction. Of course, it wasn't mentioned that Judge Reel had already addressed that motion early on in the case, as most judges do. And nor was it mentioned that there were numerous findings of fact and conclusions of law dealing specifically with jurisdiction and Arelma's assets in New York. It's been asserted that the class and Mr. Pimentel had to have levied on the assets. I don't regard that as a serious assertion, because the judgment of the class and Pimentel is now almost $4 billion with interest. I think it can be reasonably asserted that the claim of the class and Pimentel would far exceed any assets of the Marcuses, and therefore we would have a claim as all Marcos assets, unless it could be established that they had more than $4 billion. And I don't think anyone has asserted that. But the fact remains that Pimentel had filed a class action lawsuit against Merle Lynch before the interpleader started. And if the purpose of the defense is raised is to say, well, there wasn't any adversity between Pimentel and Merle Lynch, that's simply not borne out by the pleadings in the case. It absolutely is, and in our supplemental appendix, Exhibit 1 is the complaint that we filed, and you will see the adverseness that's asserted there. It's been asserted by Mr. Cathcart that the probate doctrine would bar adjudication of this case. I'm familiar with the Marshall case, and in fact I tried one of the Marshall cases in the probate court in Houston about two years ago. But not for Ryan and Nicole Smith. This case just does not fit within that probate exception, because if you look at Markham v. Allen, the United States Supreme Court case on that issue, what you find is there's a key sentence which acknowledges that creditors can still proceed against the estate or against other parties having to do with the estate, so long as it doesn't affect the probate. This will not affect the probate. And let me add some facts that are of record. Imelda Marcos and her son, Ferdinand, were named as defendants in this case. They defaulted. They are no longer in this case. The estate of which they were the representatives no longer has an interest in this case. So I don't believe that the probate exception could apply for any reason. The Republic has gone back to its reassertion, and I forget how many appeals we've been through now dealing with indispensable party jurisdiction or non-jurisdiction under Rule 19A and Rule 19B. And the panel that Chief Judge Schroeder chaired in that decision only ruled as to Rule 19A. It left open the issue of 19B, as Mr. Bomsey correctly said. That panel said, well, on one hand, the Philippines is a necessary party under Rule 19A, but on the other hand, there's no alternative forum. Now, I think at some point the law of the case comes in. And the law of the case here is that there is no alternative forum. Mr. Bomsey is simply wrong when he asserts, well, this can be resolved in the Philippines. Well, there's no ruling on indissensibility. That's the law of the case, no ruling. Well, may I disagree with Your Honor on that? You may, but I think you fly in the face of Judge Schroeder's decision. They did not decide it. Well, I agree, Your Honor, that they didn't decide it, but I... Well, then there's no law of the case on it. There's maybe some miscommunication between us. Let me explain. On February 20th of 2004, a panel of this court decided that the trial in this case could go forward. They expressly had before them Judge Reel's findings with regard to whether or not the Republican was an indispensable party. And they specifically said that there had been no abuse of discretion by Judge Reel, which is the standard for review. Now, I agree with you completely that in their October 31, 2002 decision, that they didn't make any determination as to indispensability under Rule 19B. I think we can all agree on that. All right, but did they in this later decision? I believe they did, Your Honor. Implicitly somehow? Well, I don't think it's as... It's not explicit. Well, the language sure sounded that way to me, Your Honor. And I don't, you know, without going back to my brief, I don't have that. But before you, maybe you have it more readily. But the matter on the indispensable party was briefed. It is in the briefs. Pimentel briefed it, and in the reply brief, the Republic briefed it. I submitted those pages, together with my motion to dismiss early on, dealing with the standing of the Republic. And as you know, there's been a recent decision holding, that is on December 28 of last year, that the Republic had no standing to appeal in another matter. Now, here, there's a real question as to whether the SEC versus Wenke standards are complied with by the Republic. It's a non-party at this point. It's not a normal appellate. Furthermore, there's a Supreme Court decision that I think is overarching in terms of the decision on this. And the name of the decision, and it was cited in our motion to dismiss, was Marino v. Ortiz. And what Marino v. Ortiz said is that where a non-party could have intervened, but chose not to do so, it cannot appeal. Is that a sovereign? Excuse me? Was that a sovereign? It was not, Your Honor. Well, that's the difference. Well, we can talk about that. Oh, you want to talk about it. Okay. We're in a situation that I don't think any other court has addressed, and that is where a sovereign, a foreign sovereign, doesn't want the United States court to adjudicate this. Now, this is the same sovereign who has used courts in this circuit, has used this circuit court, and throughout the country in over a dozen cases to try to collect Marcos' assets. Now, it's also a case, and I would analogize a bit to the Army v. McCarthy hearings. I've got a piece of paper here, and this says that we, the Philippines, have a claim. We're not going to tell you what that claim is, but we've got this claim. And it's an important claim, and it's more important than all the other claims. Now, I will tell you this, Your Honor. I'm just an old trial lawyer, and I do it by the book. I gather evidence. And I haven't gathered any evidence that shows me that this money ever belonged to the Philippine government. Don't forget, this is the same government that says, oh, well, we also own the share certificates. And, of course, those share certificates are in the Philippines. But the evidence is incontrovertible. The share certificates were never owned by anyone except Marcos and the Swiss banker that held them. So can this court, and can the district court, more importantly, be held hostage by a foreign sovereign that says, well, I'm sorry, we're sovereign, and you can't adjudicate this. So you get into a limbo. No other foreign sovereign that I've been able to find in any reported case law has ever asserted that. Not Iran, not Libya, not some of the usual suspects that you would think might simply or Cuba might have tried to disrupt proceedings in the United States. They have let the matter go to adjudication. And as I've told you before, there can't be any rational adjudication in the Philippines. And Mr. Bomsey was wrong when he told you that there's been a year and a half there's been a motion for a summary judgment pending. Not the case. Four days after Judge Reel's decision, a motion was filed. But let me take you back factually. The forfeiture case, which was the big case, the one that Mr. Bomsey told Judge Schroeder it's about to be decided, that case mentioned Arelma just like it mentioned a lot of other things. But there was no relief requested as to Arelma. No relief in a 125-page complaint. We brought this to Judge Reel's attention after Judge Schroeder's decision and said, you know, the Philippine government or Supreme Court simply isn't going to decide this matter because it's not in the adjudication. And guess what? A few days after Judge Reel made his ruling on vacating, the Philippine Supreme Court did rule. Arelma isn't mentioned. In an over 100-page decision, the word Arelma doesn't appear. So what does the Philippine government do? Nothing. They wait until four days after Judge Reel makes a ruling on the trial of the Mertz, and I guess they read about it in the newspaper, and they file a motion with their court. It's actually the lower court called the Sandigan-Bien asking for relief. Well, what's happened? Well, nothing. Their claim is it's a forfeiture case. Well, a forfeiture case in the Philippines is an in-rem proceeding. They don't have the assets. It can't be in-rem if they don't have the assets. Assets are here. So there can't be any relief in the Philippines. Moreover, Mr. Bomsey acknowledged an oral argument before Judge Schroeder, and the Judge Schroeder court accepted that Mr. Cathcart and I and our clients cannot be parties to the proceedings in the Philippines, simply between the Marcoses and the government. That's not an acceptable solution. That doesn't permit us to assert our rights. And the Philippine government, at the same time, and you have to understand this strategically, has over 100 criminal cases pending against the Marcoses. That's sufficient leverage to get them to do what they've done before, which is basically get a default against them and have them not put in any evidence. So guess what? The Philippine government wins. And that's what they're saying to you. They want to win, but they want to do it surreptitiously. Now, interestingly enough, and I know I've mentioned Judge Schroeder a number of times, and she wrote a decision in the mid-1980s involving a Libyan bank, and it's been cited in different matters, in fact, and cited by Judge Reel below, saying that when a party makes a strategic decision, it has to accept the advantages and disadvantages of that. Now, if that applied to Libya and a Libyan bank, I think it also applies to the Philippine government and the PCGG. Judge Reel spent a considerable amount of time making specific findings on indispensability. The standard under Rule 19b is inequity and good conscience, and so it's addressed to the equitable side of the court. And I submit those findings are substantial. A lot was made to do in the briefs as to the statute of limitations and whether Judge Reel was wrong in asserting that the Philippine government, not a party, whether its claim would be barred by the statute of limitations. Now, the real statute of limitations that applies is the New York statute of limitations. Who is the Philippine government going to sue? Oh, they're going to sue Merrill Lynch. Under what statute could Merrill Lynch be liable? Well, it would be a New York statute. That's where they did their work. That would apply to what they did. That statute has long expired. Philippine government has somewhat confused the issue and said, well, under the Philippine Constitution of 1987, that created or took away any statute of limitations on actions against public officials. Well, that's fine, except then it's ex post facto because any claim arose at least by 1972 for theft, for having taken property, 72. Marcos was out of office in 86. Also, Marcos is dead, and they can't bring any criminal proceeding against a deceased person. So I submit that Judge Reel was quite right on this record, that while the Philippine government has a potential claim, and that's why it was a necessary party under 19A, its claim is not impaired under 19B. Can I ask you about the 2002 decision, where we say later developments may render it more equitably feasible for proceedings to go forward in this case. Such developments might include resolution of the litigation in the Philippines or a change in the immunity status of the Republic. Now, did either of those events occur? There's been no change in the latter one, which is the claim for immunity. As to the former, the reference was to the Supreme Court case, and that was what was in all the briefs. That's what Mr. Bomsey said. Look, the Supreme Court of the Philippines is going to render a decision shortly on this. By the way, I don't want to mix up my issues, but active state just doesn't exist in this case. There's no act with regard to the realm of matter. There's no decision. And the decision that Judge Reel... But can they before the court now? Well, if they can resurrect it. They waited until more than one year passed after the decision of the Philippine Supreme Court. Now they make a motion for summary judgment in a matter which is final and executory, and that's the exact wording that the Philippine government has asserted as to its decision. There has to be some finality. There never was a claim for a realm in their original complaint. And I'm probably the only lawyer among the lawyers here who has ever gone through and searched the docket in the Philippines. I sat there. I went through the entire file, all the pleadings. A realm is not being litigated over there. And all the time that the Philippine government or Philippine National Bank could have submitted to the court some evidence of pleadings or something, it's missing. So that's why I say it's Army versus McCarthy. I have here something in my hand. Well, where is it? In America, at least, we're supposed to give that to the court and the judges. Now, Judge Noonan, you seem to be troubled that maybe we're trampling on the rights of a foreign sovereign. But I don't think that's the case. They simply have had every effort, and Judge Reel has analogized this to an invitation to seek property. Put in your evidence. Show us what you got. Show your card. But if you don't want to do that, then go home. Or, more importantly, go ahead and sue the Marcoses. You know, there's nothing that stops them from suing the Marcoses in the Philippines. Marcoses have a lot of property over there, which we're not allowed to touch, because, by the way, the Philippine courts won't recognize your judgment. They won't recognize the judgment entered by this court until... Is there a case on that? Yes, there is. There's a case pending in the United Nations that I filed a complaint on last fall, accusing the Philippine government of violating the rights of human rights victims because they won't even give us a decision. We were dismissed in the trial court because we didn't pay a filing fee, as they calculated it, of $8.4 million. $8.4 million. We filed a direct appeal to the Philippine Supreme Court as of right. Philippine Supreme Court, let's see, it's now six years. Six years. No decision. So, Judge Noonan, and I sense this in your concern that we're trampling on the rights of a foreign sovereign and we're just abusing them. That is not the case here. And, furthermore, these are human rights victims. You know, these are... Is it fair to infer, I ask you this as an open question, that most of those victims are Filipinos? I couldn't hear the last word. Is it fair to infer that most of those victims are citizens of the Philippines? It's fair to infer that most are, not all. So it's a peculiarity of concern to the Republic as to how they'd be treated. I wouldn't say that because they've been abused by their own government. By a tyrannical government. And by subsequent governments that have ignored their pleas for relief. I must tell you, I'm sure, I think you get some background on the lawyers. I spend about one-third of my time doing human rights work. I don't just do it in the Philippines. I do it in Europe. I do it in South Korea. I do it in various places. And the hardest thing in the world is collecting on judgments. Most judgments, as you know, are entered by default. And you look at some of the seminal cases in this area, Philartica v. Pinaralla, and all that, the litany of cases, the Karadzic case, up in the Second Circuit. None are collected. I intend to make this case different. Because I intend to assert... I do that because it goes to the equitable considerations here. You've got 9,000 past victims. You've got $35 million to distribute among them. You all get a slice of it. How much is each individual going to get? I would say of this portion, assuming it's about $40 million, that they'd at least get $3,500 each. Do you know how much that is in relation to their annual income? I have no idea. It's three-and-a-half times their average annual income. And the annual income of these people, because they are among the very poor. You take a breadwinner away from a family in a rural area, and they have nothing. And that's what many of these people were. There's very few that really have any money of any consequence. And they've certainly never been able to pay costs or counsel fees to anybody. Will that be meaningful is your question. That's right. And the answer is it's a start. Am I happy about it? No. Do you know how much I got for slave laborers when I settled with Germany and Austria? $6,500 each. Is that enough for a slave laborer? No. But the Holocaust cases are always held up as an example, a shining example, of what can be done. And I only wish that we could have done the same thing for veterans who were tortured in Japan, but we couldn't. And you know that decision of this court. I have roughly 13 minutes remaining. Let me touch on some other subjects, if I may. But to also mention that under Rule 19b, there are four major considerations. We've laid them out in our brief. But certainly the most important is whether or not the claim of the Philippines is impaired in some way. The Philippine government, assuming that it has a viable claim, can sue the Marcoses, can sue them in the Philippines, can get a judgment against them, and can collect on it. The only question really is whether they can collect on the assets that are here and deposited in the district court. So it's a collection issue, not an issue as to whether they're entitled to a verdict on liability and damages. It's a collection issue. I only wish I was assured of collection in human rights cases. We're not. But the Philippine government has had many opportunities to put into evidence the assets of the Marcoses in the Philippines they have. And I happen to know what assets they have. I only wish I could execute on them in the Philippines. But as I mentioned, their courts won't let us. Mr. Ziegler addressed the conflict of laws issue, and let me just touch on that. We claim that the statutes on which jurisdiction is predicated arise under federal law, and therefore the court appropriately applied federal common law, and federal common law on the issue of Puerto Rico is well understood. And there was an important reason for that, and that is the decision of the U.S. Supreme Court in First National City Bank. I think it was a 1983 decision, and Mr. Ziegler in his brief has said, well, you know, that was really a very narrow decision. It involved a Cuban corporation. Except that the paragraph, which has the seminal law in it, begins, as a general matter, and then talks further. I don't think the Supreme Court was trying to limit that decision to Cuba or a Cuban corporation. It was talking more generally, and it made an important distinction between the internal and external law that applies to a corporation. No U.S. court has ever applied the Panamanian Alter Ego Law. And, of course, we don't really know quite what it is. There isn't any decision that we've been able to find on point under Panamanian law. The, I think, good decision to cite to you is the Goya Foods decision, which was a First Circuit decision applying New York law in connection with a Panamanian corporation as to which the veil was pierced. And Goya Foods recites what the law in New York is, the elements that have to be satisfied there. It, in that instance, applied, of course, it wasn't an interpleader case. It applied New York law. It did not apply Panamanian law. And another issue that arose in connection with that is whether or not reverse piercing of the corporate veil is permitted. And, you know, you have an individual and a corporation, and one is direct and the other is reverse. And federal law, at least, is that, and New York law, is that reverse piercing is permitted. I already addressed the evidentiary issues that Golden Buddha had raised in its brief. Let me just mention some of the evidentiary issues. Actually, I found them interesting because, as I say, I'm a trial lawyer at heart. And I know, Judge Robart, you're a trial lawyer, and so I'm sure there was some resonance with you as to these issues. But we proved that this was a Marcos-owned corporation in several ways. And pierced the corporate veil in several different ways. For example, there were two decisions of the Swiss Federal Supreme Court, the highest court in Switzerland, which said that Arelma was simply an instrumentality of Ferdinand Marcos. That decision was put in for the very limited purpose of that. And we contend that, based on offensive collateral estoppel, Arelma cannot now assert that that finding is invalid. And we went so far as to show that not only do we satisfy U.S. law on this, but that Switzerland also recognizes the principles of res judicata and collateral estoppel. And that's something you find in all common law countries. So those Supreme Court decisions in Switzerland were one indicia of evidence. Another was the Sunye memorandum. Now, Mr. Sunye is a very colorful character you might have gathered from reading the briefs and the record in this case. I insisted on taking the deposition of Mr. Sunye. His company, SunTrust, was a defendant in the case. Mr. Sunye resisted that, resisted to the point of contempt. And only after the contempt citation had run up to $330,000 did he consent to giving a deposition. What did he say at his deposition? It's in the record. It's in evidence here. He said, what I said in my 1997 memorandum is true. I was required to submit that to a judge in Switzerland as part of an evidentiary record they were trying to build on this matter. In that memorandum, of course, Mr. Sunye states what the relationship was and how Rommel was started. And by the way, independent evidence, letters that Sunye wrote back in the 1972 period to and from established how the account was established, when it was established, how much money was deposited into the account. So that was another indicia. SunTrust also responded to requests for admissions. Those are in evidence. Now, SunTrust was a party at trial even though it didn't show up. Those admissions are binding on SunTrust. They're not binding on other parties, but they nonetheless are evidence that is usable in the case with regard to all parties. And I don't think there's anything surprising about that assertion. There is also a claim that the findings of Judge Real, this court, the Second Circuit, that the Amarcuses had a pattern and practice of creating shell corporations and depositing money in there. They assert that those findings are admissible. Well, they're certainly admissible as to a realm because we've cited a number of cases where there is where there's privity between a shareholder and a corporation. And in this case, Ferdinand Marcos and the realm that findings are imputable from one to the other. So they're certainly imputable to a realm and, therefore, Philippine National Bank. Mr. Bomsey asserted that the recent decision of the panel in a separate matter dealing with the act of state doctrine, a matter which is currently pending before you on a motion for rehearing on bank, is something that you should take under consideration. That is, his assertion is that there is an act of state and that you must dismiss this matter for lack of justiciability. Putting aside that panel decision is where we've raised the issue as to whether a judicial decision can ever be the subject of an act of state. But putting that to one side, there's nothing in the Philippines with regard to a realm which constitutes an act of state. There's no decision by its courts. How can there be an act of state? Furthermore, it involves money, assets that are in this country. And all the seminal decisions by the U.S. Supreme Court on act of state require that the act of state must be with regard to matters in their own country or else it doesn't apply. I think I've covered all the matters I wanted to cover. I certainly talked for longer than I wanted to talk. And unless you have any further questions, I'll sit down. Thank you very much. Thank you. There's a lot of ground to cover and I don't have much time. So I'll just try to hit what I think are some of the high points in response to Mr. Swift's comments. First of all, he talked about the genesis of this case. And I think that's important to keep in mind from the perspective of subject matter jurisdiction and also why my clients lost virtually every motion and had every piece of evidence that we wanted offered excluded and why Mr. Swift's clients had almost every piece of evidence that it wanted admitted into evidence. And that's because this case didn't result from an agreement between Merrill Lynch and Mr. Swift regarding the filing there. There's nothing in the record to support that. What the record shows is that Judge Rio issued an order in MDL 840 about a week or two before this interpleader was filed, summoning Merrill Lynch to come into his courtroom in Los Angeles and explain to him about the Arelma assets. And the record shows that at that hearing he ordered Merrill Lynch to file the interpleader in Hawaii and to deposit the assets there. That's found in the excerpts of record pages 17 and 24. So I think that background indicates that the infirmity in the subject matter jurisdiction emanated not only from the fact that there was no race, no asset in Hawaii when the action was filed, which is a requirement for a proper interpleader, but also that the case began with an unauthorized order. Judge Rio's order to Merrill Lynch to file an interpleader in Hawaii was not a proper exercise of his authority. This court's decision in Halau v. State of Marcos established that. It was a very similar situation where two Swiss banks with offices in California were summoned before Judge Rio in order to deposit money into the registry of that court in aid of the enforcement of Mr. Swift's client's judgment. And this court held that that was improper, that federal courts are limited to use of a writ of execution to aid the enforcement of a judgment unless there's some extraordinary circumstances. There's nothing extraordinary about this case. The assets were located in the United States. If Merrill Lynch wanted to file an interpleader, it could have on its own. It could have filed it in New York, which would have been the more logical place, not in Hawaii 5,000 miles away. The issue of the ownership of the Arelma shares and its assets, our position is that there was no evidence properly admitted which would support the finding that Marcos was the source of the $2 million, even if you assume that the Sunni memorandum was admissible, that would only show that Marcos and some crony of his, Jose Campos, was involved in establishing Arelma in 1972. But there was no evidence that the source of the funds ever came from Marcos. Moreover, even if we assume that Marcos was behind Arelma and that he was behind the $2 million, there's no evidence whatsoever that Marcos or his estate ever used Arelma for any improper purpose or that it was incorporated for an improper purpose. There's nothing wrong with incorporating a company in a foreign country, establishing a brokerage account in the United States and putting money in it and letting it sit there for 28 years. That's all that happened. There was no evidence that any of those assets were ever used by Marcos, his family, or any of his cronies. The alter ego doctrine under any incarnation, at least in the United States if you exclude Panama, which doesn't recognize it, any incarnation of the alter ego doctrine requires that for there to be a piercing of the corporate veil that the corporation was either incorporated for an improper purpose to commit a fraud or was misused by the incorporator. There's no evidence that that ever happened here. Well, how about hiding his ill-gotten wealth? There's no evidence that that was ill-gotten wealth. There's only evidence that the $2 million that was deposited in the Merrill Lynch account came from an account... We know his salary, though. Pardon me? We know his salary. Where did the rest of the money come from? I don't know. There's no evidence of that one way or the other. I think if the Republic would have been part of the case in the trial court, maybe they would have had some evidence. Mr. Swift didn't have any, so there's a hole in the record. Even under New York law, which the district court relied on in part, there's a requirement that the corporation have committed some fraud or some wrongdoing at the instance of the shareholder, which was a wrong against the claimant. You just can't have a claimant... Hiding the money from people that you've victimized is a wrong against them. But I don't think that if Marcos formed a realm in 1972, he was doing it to hide money from the clients represented by Mr. Swift. Their judgments are not based on any financial transaction, taking of assets, or anything of the like. While they certainly were abused by the Marcos regime, it was in the nature of personal injuries, and there was nothing to do with a realm that related to the wrongs that was inflicted upon Mr. Swift's clients. So I think if you look at the alter ego doctrine and the way it's supposed to be analyzed, there's a problem with the application of it, even if you assume all the underlying facts, as Mr. Swift would. Even if you assume those facts, there's a problem with applying it to the situation where we have here, where there was a passive investment for 28 years in New York. The Marcoses never saw one penny of that money. By the time it was interpleaded, the share certificates of Arelmo were already in the hands of Philippine National Bank as escrow holder, and the Marcos family would have no right, no ability to touch those assets. In fact, the evidence shows that in 1997, Imelda Marcos called up Mr. Sunye and said we're going to hold a director's meeting in the United States for Arelmo, and we want you to follow whatever direction the directors that we appoint, we want you to follow those directions in dealing with the account. Mr. Sunye took the position clearly, and it's all in the record, that that was an outlaw meeting, that he did not recognize it, that he did not consider Mrs. Marcos to be a representative entitled to direct the affairs of Arelmo. So I think that if the equities are to be considered, those things have to be taken into account also. Our position as Arelmo is that we own the assets, that they should be distributed to Arelmo, held by Philippine National Bank and the Philippines in escrow, to be distributed according to a decision of a competent court of the Philippines, which is what the escrow agreement requires. Thank you. Thank you very much. Your Honors, I wonder if before I begin I might ask an indulgence, which is by my lights given the particular peculiar configuration of this argument. I was given 15 minutes, and I believe by my count Mr. Swift spent a good portion of his argument dealing with my clients, and if the court would indulge me with an additional three or four minutes, I'll try not to take all of that. That's fine. I appreciate that. Let me begin, Mr. Newman, if I may, by answering the question that you put to Mr. Swift, which is whether there has been any change within the decision that Judge Schroeder rendered, and our answer is no. He conceded that there has been no change in the immunity status. There also has not been a final resolution of the Philippine litigation. It is true that at the time I argued it before Judge Schroeder and her colleagues, we expected that the Philippine Supreme Court would resolve the ARELMA claim, but it turned out it didn't. Therefore, after the matter was considered on petitions for rehearing, which took several months, the Philippines had to go back, I'm sorry, the Philippine government had to go back into court in the same litigation, and it had to seek the ARELMA assets specifically. He did not have in front of him the language of the Schroeder panel that says, we conclude the district court ultimately acted within the spirit of this court's mandate and properly exercised its discretion. Now, he says that's the law of the case. What do you say to that? It, by definition, cannot be. That was a 1292B appeal limited to a particular question. The indispensable party ruling from which we appeal was a separate ruling made a month later. There was a separate request made to certify that. You'll find that, I believe, at page 761 of the record. That was refused. This court not only did not purport to go through the 19B analysis, but it, by definition, could not without violating our rights. We couldn't brief that. This is the time when we are here to hear this. I've got another question for you. He made the point that the Republic could not forfeit this property without bringing in action in the United States where the property is. But that's simply not correct. Why is it not correct? Because, in fact, the forfeiture proceedings, which originally began in the Philippines, had to do with assets which were not at all in the Philippines. They had to do with assets which, at the time, were in Switzerland and other places. The declaration of forfeiture has to do with an action against the Marcoses there by the government against the Marcoses. That will be resolved, and it will have whatever effect it has. How do you hope to collect on that in the United States without filing an action thereby waiving your sovereign immunity? It may well be that at the time when we have that judgment, we will decide to come to the United States to do that. That is something that could happen. But that's very different than saying that we're required, Judge Thomas, to allow this court to determine that. But playing it out, you're going to end up here anyway. It is conceivable that that will happen. It is conceivable something else will happen. But the one thing we know will happen if you affirm is that this money will be gone and that our right to have a meaningful invocation of immunity will not be permissible. If I turn to Judge Robart's question, American Greyhound, Judge Robart, is the latest of the cases that are before the court that discuss the question he raised to me, what if there is no alternative form? We believe there is an alternative form, as I described. But what if, as Mr. Swift claims, there isn't? Well, this is what the court said. Because in that case, the court said there's no adequate remedy available to the plaintiffs if this case is dismissed for lack of joinder of indispensable parties. But this result is a common consequence of sovereign immunity, and the tribe's interest in maintaining their sovereign immunity outweighs the plaintiff's interest in litigating their claims. We have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or form for the plaintiffs. And that is the rule which we rely. I should observe that while I was incorrect as to my timing, and I guess I'm Joseph McCarthy now, standing here with a piece of paper in my hand, but it is not the paper in my hand that's important. It's the fact that it is a piece of paper in the record, which is a request for judicial notice, which contains the filing that has been made in the forfeiture proceedings that have been ongoing that deal specifically with the realm that I think is critical here. That was filed last November. I think I have taken more than fair advantage of this court's time, and I appreciate your attention. I'd like to make a few observations. Mr. Buckley's deposition was offered, contrary to what I believe I heard Mr. Swift say. His deposition and the other Filipino witnesses' depositions were offered, and an offer of proof rather extensively was filed. It burdens this record with lots of paper that I hope somebody will take the time to read. As far as Mr. Buckley is concerned, the rule makes it clear that if a report is due, the deposition shall not be taken. Mr. Swift elected to go ahead and take the deposition, which constitutes a waiver. But even if there wasn't a waiver, he was given an opportunity to take it again and elected not to do so. As far as the litigation in the Philippines is concerned, I'm sorry, there was a comment made that the Marcos's have no interest in this case. That's true. There are ramifications to their kleptocracy, as it's been referred to, criminal ramifications that affect their behavior in the United States in judicial proceedings and also in the Philippines. Certainly a summary judgment, which in essence is a summary judgment by default, doesn't establish facts binding on non-parties and can't do so. One of the things that concerns me is the possibility that this court may say this case involves primarily Filipinos who are harmed in the Philippines. And therefore, why not let the Philippine government handle this case? And we have had no effort made by anybody for what effectively is a 1404A transport. But one of the essential elements for a change of venue is for the party to show that there was a suitable alternative form. And we haven't had that opportunity. And if there is any temptation by this court to send this case to the Philippines, we would like to have that opportunity. And I think I can speak for Mr. Swift without his permission and assure this court that no suitable alternative forum exists in the Philippines for the handling of this case, where justice will come within a reasonable time or come at all. And one last comment. I see the red light is on. And that is one of the consequences of the Philippines missing the trial is they have never shown that they have any interest in this fund. As a result, without an interest in the fund or without even showing that there is some interest in the fund other than monetary, they stand in the same position. Mr. Swift, they're not entitled to share in the fund and they're not entitled to complain of this court's response. Thank you very much for your kind attention. Well, if you if you do rely on that, we're going to allow him some time to respond. So I think we better better consider it submitted. All right. We'll give you 60 seconds and we'll have an additional 60 seconds. There was a question raised as to what was considered on a 1290 to be appeal. As you know, the the law in the Ninth Circuit is that this court may consider supplemental issues that it deems important, even when on a matter where an issue is certified. And the language that your honor quoted wasn't all the language that was in the decision by Judge Schroeder and the other judges. It began the district court subsequently held a hearing. And they're referring to the later hearing and entered findings of fact regarding the impact of the Philippine litigation and the propriety of going forward in the absence of necessary parties, i.e., the republic and the PCGG. And then it concluded that the court had not abused its discretion. The second point I'd like to make is that Mr. Bombay said, well, gee, there was a you don't have to have a property in the Philippines for a forfeiture. That's not what the Philippine Supreme Court said in its decision. That decision, Mr. Bombay submitted. It says forfeiture is in rem. Secondly, it said we, the Philippine Supreme Court, have custody of the assets transferred from Switzerland. They don't have custody of the assets in the district court. Thank you very much. Thank you. All right. I want to thank all counsel for their presentations, both written and oral today. I know we constrained you in time. I know you've lived with litigation a long time. We could speak for hours on it. And it's a fascinating case. But I appreciate the economy of the presentation. And we will take the matter under submission. Thank you very much. If I may supplement Judge Thomas's remarks, I first encountered these issues in writing for the Allen Bank Court in 1988. And it's a great interest to return to them again today. Thank you very much. All right. This court is now adjourned.
judges: Noonan, Thomas, Robart